UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:

                                         Chapter 11 (Jointly Administered)

    Rubin Family Irrevocable Stock Trust,
    et. al.,

                                         Case No. 13-72193-dte

         Debtors.
-------------------------------------------------------X

## MEMORANDUM OF DECISION

*Appearances:*

Rosen & Associates, P.C.
*Attorneys for Debtors Robert M. Rubin, Rubin Family Irrevocable Stock Trust, and Robert M.*
*Rubin Family Realty Trust*
747 Third Avenue
New York, NY 10017-2803
By: Nancy L. Kourland, Esq.; Sanford P. Rosen, Esq.

Paul A. Rachmuth, Esq.
*Attorney for Debtor Margery Rubin*
265 Sunrise Highway, Suite 62
Rockville Centre, NY 11570

Parsons Behle & Latimer
*Attorneys for creditor ACE Investors, LLC*
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
By: J. Thomas Beckett, Esq.; Gary E. Doctorman, Esq.

Anderson, Kill, & Olick
*Attorneys for creditor ACE Investors, LLC*
1251 Avenue of the Americas
New York, New York 10020
By: David Graff, Esq.; Shveta Kakar, Esq.

Honorable Dorothy Eisenberg, U.S. Bankruptcy Judge

## Introduction

Before the Court are the several motions by judgment creditor Ace Investors, LLC ("ACE") to dismiss the procedurally-consolidated bankruptcy cases of the following debtors (collectively the "Debtors") or, alternatively, for relief from the automatic stay in those cases:

(1). Margery Rubin ("Margery"), Case No. 13-72195-dte;

(2). Robert Michael Rubin, husband of Margery ("Robert," and collectively with Margery, the "Rubins"), case no. 13-73193-dte;

(3). The Rubin Family Irrevocable Stock Trust (the "Stock Trust"), case no. 13-72193-dte;

(4). The Robert M. Rubin Family Realty Trust, case no. 13-72194-dte (the "Realty Trust," and collectively with the Stock Trust, the "Trust Debtors").

For the reasons that follow, ACE's motions are denied in their entirety.

## Jurisdiction and Venue

This Court has subject-matter jurisdiction over these proceedings under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## Background

I. The Rubins and the Trusts.

On April 30, 1997, Robert (as donor) settled the Stock Trust, the Realty Trust, and the Robert M. Rubin Marital Trust (the "Marital Trust"). The Marital Trust is not a Debtor in this Court.

Robert, Margery, the Stock Trust, and the Realty Trust are the Debtors in this Court. Margery and Errol Rubin (Robert's brother) are the trustees for each of the Trusts.[1] The beneficiaries of the Trusts are the Rubins and their three (3) children.

Robert himself is the "advisor" for the Trusts. Robert does not "officially" have any authority over the Trusts. Even so, he seems to have done all the "heavy lifting" with respect to finding, negotiating, proposing, and consummating the Trusts' various business dealings over the years, while the actual trustees seem to adopt his recommendations largely without reservation.

Robert originally funded the Stock Trust and the Realty Trust with $100 apiece. He funded the Marital Trust with approximately $8 million, which he obtained from the liquidation of his equity position in Lifetime Corporation ("Lifetime"). Lifetime is a home healthcare company that Robert founded, grew, and took public. The purpose of the Marital Trust was to lend money to the Trust Debtors, which funds the Trust Debtors would turn around and invest. In times of active liquidity, the Trust Debtors were supposed to repay the Marital Trust. To that end, each respective Trust Debtor lists substantial unsecured debt owing to the Marital Trust. Specifically, the Stock Trust's amended schedule F indicates that it owes the Marital Trust approximately $402,423.47 for "loans," and the Realty Trust owes the Marital Trust approximately $4.8 million for "loans."

The indentures for each of the Trusts give the trustees broad discretion to hold, sell, lease, invest, reinvest, and otherwise deal with trust property without regard to many of the restrictions that encumber trustees of traditional common-law trusts. The trustees are also largely protected from liability for losses the Trusts may incur. The Trusts have no offices of their own, nor do they have any employees in the traditional sense.

---

[1] The capitalized term "Trusts," as used herein, refers collectively to the Realty Trust, the Stock Trust, and the Marital Trust. Nevertheless, it bears repeating that the Marital Trust is not a Debtor in this Court. The only Debtors here are Robert, Margery, the Stock Trust, and the Realty Trust.

Robert states that he "created the Stock Trust for the specific purpose of identifying and investing in start-up companies and the Realty Trust for the specific purpose of identifying and investing in, directly and through limited liability companies, commercial and residential real estate throughout the United States." The indentures for the Trusts also indicate that one of their purposes is to enable Robert to avoid probate in the posthumous administration of his assets. They also contain elaborate provisions concerning distribution of the *res* upon the death of either or both of the Rubins.

The Realty Trust owns 100% of the equity in the following entities: Rubin I, LLC ("Rubin I"); Rubin II, LLC ("Rubin II"); Rubin III, LLC ("Rubin III"); and Rubin V, LLC ("Rubin V"). The Realty Trust owns 50% of the equity in McLain Rubin Realty Company, LLC ("MRR I"); McLain Rubin Realty Company II, LLC ("MRR II"); and Rubin IV, LLC ("Rubin IV"). MRR I owns 100% of the equity in McLain-Rubin Texas I, LLC ("Texas I") and McLain-Rubin Texas II, LLC ("Texas II"). In total, the Realty Trust (according to its schedules) is owed approximately $4.7 million by Texas I, Texas II, MRR II, Rubin I, Rubin II, Rubin III, and JSC (defined below), collectively. The Stock Trust owns or has owned equity positions in various entities, as discussed more fully below.

The "McLain" in the "McLain-Rubin" companies comes from two individuals, husband and wife, named Dean McLain ("Dean") and Cindy McLain ("Cindy")(the "McLains"). The Debtors have had extensive dealings with the McLains.

In 1998, shortly after the Trusts were created, Robert donated to the Stock Trust his 30% equity position in a company called American United Global, Inc., which in turn owned 100% of the equity in 2 distinct businesses. One of these businesses manufactured "O-rings and seals" for

the automotive industry, and the other was a subsidiary of American United Global, called Western Power and Equipment ("Western Power").

It was in connection with Western Power that Robert met Dean. At the time, Dean worked for a company called Case Construction, which owned certain distribution sites located in California, Nevada, and the State of Washington, together with the underlying real estate (the "Case Sites"). Pursuant to a business plan that Dean presented to Robert and others, Western Power was created to (and did) purchase the distribution centers on the Case Sites, but not the underlying real estate. Robert and Dean formed MRR I and MRR II to purchase the underlying real estate, which in turn was leased to Western Power, which operated Case equipment dealerships on the Case Sites. Robert owned 50% of the equity in both MRR I and MRR II, which he donated to the Realty Trust.

Western Power was eventually spun off into a publicly-traded company, whereupon the Stock Trust received a minority equity position in Western Power, which was worth about $3-5 million according to Robert. However, the Stock Trust's shares in Western Power lost all value when Western Power's secured creditors liquidated it. Even so, in 2007 MRR I and MRR II sold their interests in the California and Nevada Case Sites for a profit, upon which the Realty Trust realized a distribution of $2.3 million. (Later on, in 2012, MRR II sold its interest in the Washington Case Site for $900,000, out of which the Realty Trust realized $462,000.)

With the money that the Realty Trust realized from the sale of the real estate underlying the California and Nevada Case Sites, it lent a total of about $546,000 to Rubin I, Rubin II, and Rubin III, which in turn used the money (on Dean's advice) to buy residential real property in Texas that Dean's son in law had developed (the "Texas Residential Properties"). The Texas

Residential Properties have been leased out to tenants over the years, and they have proven to be a lucrative investment. In addition to this, the Realty Trust lent $1 million to Western Power.

Meanwhile, in or around 1999, on Robert's advice the Marital Trust lent the Stock Trust approximately $500,000 to invest in a new company called National Fiber Networks. This investment ultimately produced $5-6 million in gross returns for the Stock Trust.

In 2005, the Marital Trust lent the Realty Trust $500,000 to invest in a company called 767 Encuentro Holdings Corp. ("767"), which was formed to develop resort properties in the Dominican Republic. 767 ceased operating due to its inability to obtain financing for its project. A similar scenario played out with respect to a later investment, in which Realty Trust borrowed approximately $600,000-650,000 from the Marital Trust in order to invest in a real-estate development project in Costa Rica.

That same year, the Marital Trust lent the Realty Trust $1.923 million, which the Realty Trust used to purchase a certain condominium in Manhattan (the "Manhattan Condo"). Robert states that the Manhattan Condo was initially intended to be rented out as an investment property, but it eventually became a part-time residence for the Rubins due to various family circumstances. This transaction was fairly unique among the Trusts' various dealings in that (according to Robert's testimony), Margery was the one who instigated it, rather than Robert.

In 2006, the Marital Trust lent the Stock Trust about $1 million, which the Stock Trust used to buy an equity position in a British company called Veritas Medical Diagnostics, Inc. ("Veritas"), together with the distribution and marketing rights for a diagnostic medical device that Veritas was to manufacture. Veritas halted operations after failing to obtain necessary government approvals for the device. A similar scenario played out regarding the Stock Trust's separate $750,000 investment (all of it lost) in another medical device company called Scantech.

Later, the Realty Trust lent $937,685 to Texas I and $1.386 million to Texas II. These loans were used to purchase two pieces of commercial real estate in Texas (the "Texas Commercial Properties"). The Texas Commercial Properties are rented out at a combined rate of approximately $396,240 annually.

In 2011, the Marital Trust lent the Realty Trust $2.2 million, so that the Realty Trust could make a loan to a company called JSC Family Realty, LLC ("JSC"). JSC used this money to capitalize Rubin IV, which in turn purchased certain commercial real estate in Oklahoma (the "Oklahoma Property"), where a Buffalo Wild Wings® franchise now operates. This has also been a lucrative investment. The Oklahoma Property is pledged as security for JSC's obligations to the Realty Trust. JSC gets 100% of the profit (and bears 100% of the loss) on Rubin IV while the loan is outstanding. Once the loan is paid off, the Realty Trust becomes entitled to 50% of the profit (and must bear 50% of the loss) on Rubin IV. The Oklahoma Property is said to be worth about $2.855 million, and it produces rental revenues of about $204,000 annually.

In another transaction, the Marital Trust lent the Stock Trust $1 million to buy 8 million shares in a new company called HC Innovations, Inc. ("HCI"), which ultimately went public. The Stock Trust's interest in HCI lost most of its value when HCI's secured creditor converted its debt to equity and "diluted the outstanding common stock."

Also, the Marital Trust lent the Stock Trust about $560,000 to buy 7.5 million shares in a new medical services company called Arcadia. Arcadia went public in 2005, whereupon the Stock Trust liquidated its equity position in Arcadia over time for about $5.533 million. After this, the Stock Trust transferred $3.325 million to the Marital Trust in order to repay some of its outstanding debt to the Marital Trust.

Additionally, the Marital Trust lent the Stock Trust $119,000 to buy stock in a new Internet television network called Kit Digital. The Stock Trust's equity position in Kit Digital was eventually sold for $65,000.

Furthermore, the Marital Trust lent the Stock Trust approximately $430,000 to buy common stock in a new solar-panel manufacturing company called Solar Thin Films, Inc. ("Solar Thin"). Due to the financial crisis of 2008, customers who were supposed to buy solar panels from Solar Thin were unable to obtain financing for their purchases. Solar Thin stopped operating because of this, which in turn rendered the Stock Trust's equity position in Solar Thin worthless. Solar Thin is currently in reorganization. Robert apparently earns some income consulting for Solar Thin.

Most recently, the Marital Trust lent the Stock Trust $1.5 million to buy a 25% equity ownership interest in a German solar panel manufacturer called Algatech. Also, in addition to what has already been mentioned here, the Stock Trust owns equity positions in Amerivon Holdings, LLC; Amerivon Chloe Acquisitions; Iroquois Capital Opportunity Fund, LP; and MIT Holdings, Inc.

II. <u>The Events Underlying this Controversy; ACE and the Debtors</u>.

In the fall of 2004, a business broker introduced Robert to a man named Christopher Young, who was then chairman of ACE. ACE owned a subsidiary called ACE, Inc. (the "ACE Subsidiary"). The ACE Subsidiary ran a mobile real-estate appraisal business. Mr. Young wanted Robert to purchase the equity in the ACE Subsidiary, and Robert presented this business opportunity to the trustees of the Trusts, who agreed to it. The Stock Trust executed a promissory note in the approximate amount of $1 million (the "Note") in favor of ACE, in exchange for the equity in the ACE Subsidiary. Only the Stock Trust was obligated under the Note.

Robert became chairman of the ACE Subsidiary, reporting in that capacity to the Stock Trust. Afterwards, the Stock Trust made various loans to and/or investments in both ACE and the ACE Subsidiary, some of which was credited towards the Stock Trust's obligations under the Note. The ACE Subsidiary ceased operations in 2008.

Sometime in 2008, ACE sued the Stock Trust on the Note in the U.S. District Court for the District of Utah (the "Utah District Court"), based on the Stock Trust's failure to pay the Note. On May 13, 2010, the Stock Trust stipulated to entry of judgment against it in the amount of approximately $1.7 million, plus substantial interest, attorney fees, and costs. The next day, the Utah District Court entered judgment on the stipulation (the "Stipulated Judgment"). No one disputes that the Stipulated Judgment is final and non-appealable.

On June 8, 2011, ACE moved in the Utah District Court to garnish certain assets of Margery, the Realty Trust, and the Marital Trust, on the basis that the Stock Trust had fraudulently transferred assets to those parties in order to avoid paying ACE on its Stipulated Judgment. The Utah District Court initially found favorably for ACE, but the Tenth Circuit Court of Appeals dismissed the garnishment proceedings, finding that the Utah District Court lacked personal jurisdiction over Margery in her capacity as trustee of the Realty and Marital Trusts.

On November 19, 2012, ACE domesticated the Stipulated Judgment in the U.S. District Court for the Southern District of New York (the "SDNY Court"). On February 28, 2013, ACE commenced in the SDNY Court a turnover proceeding against all the Debtors and the Marital Trust. ACE again alleged that the Stock Trust had fraudulently transferred assets to the other Debtors and the Marital Trust, in order to avoid paying the Stipulated Judgment. Judge Victor Marrero of the SDNY Court presided over the case. Mr. Derk Rassmussen, CPA, prepared a report (on which ACE relied) in order to illustrate what ACE alleged to be transfers from the

Stock Trust to the Rubins, the Realty Trust and/or the Marital Trust. (The Debtors argue that this report mistakenly identified the true ownership of certain of the transferred assets.)

On April 5, 2013, the SDNY Court issued a temporary restraining order (the "TRO") which provided that Robert and Margery (both individually and in her capacity as trustee for the Trusts) were "enjoined, restrained, and prohibited from transferring, encumbering, disposing of, or otherwise interfering with any assets under their possession or control until further order of [the SDNY Court]," for the reasons stated by Judge Marrero on the record at a hearing held before him on the same day. At the hearing, Judge Marrero made the following comments:

> Based on the Court's reading of the record, the submissions made in writing, the affidavits and other submissions, the record of the proceedings in the Utah court, the findings by the court there, the depositions that were taken of the Rubins and the other evidence on the record, I am persuaded that the plaintiffs are entitled to the relief that they have requested. I find that the transfers that are at issue here were not isolated, as was [also] found by the court in Utah, but part of a substantial long-standing pattern to defraud. I am not persuaded that these transfers were made in good faith, given that the donor [Robert] was essentially in control of the assets. These are not arm's length transactions, by any means. I am not persuaded that there was fair consideration for the transfers but that they were made due to a clear intent to defraud, which is now so long standing and unjustified. On all of these bases I'm persuaded that the plaintiff is entitled to the relief. I will grant the petition for turnover.

At the April 5 hearing, the Debtors and the Marital Trust asked for permission to use restrained assets to appeal Judge Marrero's rulings to the Second Circuit (which would presumably include using them to post a supersedeas bond), so long as such assets were placed in an escrow account to be used only for that purpose. In response, Judge Marrero stated that he was "not making any exemptions" to the scope of the assets restrained by virtue of the TRO.

On April 23, 2013, the SDNY Court entered an order (the "April 23 Order") which augmented the amount of the Stipulated Judgment to include additional interest, attorney's fees,

and costs (the "First Augmented Judgment"). The order also imposed joint and several liability on the First Augmented Judgment against the Rubins, the Realty Trust, and the Marital Trust, and it attached certain of their assets. It also provided that a receiver would be appointed to take possession of the attached assets, which included the Rubins' home on Long Island and the Manhattan Condo.

On April 25, 2013, the SDNY Court entered another order, this one appointing Robert W. Seiden as receiver (the "Receiver"). The order in essence gave the Receiver power (among other things) to  assume control of all property of the Debtors and the Marital Trust, wherever held, to the exclusion of all others, and to sell it to satisfy the Augmented Judgment.

On April 27, 2013, Margery and the Trust Debtors filed separate voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code. (Robert filed his voluntary chapter 11 petition on June 16, 2013.) Pursuant to 11 U.S.C. § 362(a), these filings automatically stayed any efforts by ACE to collect on its various judgments against the Debtors. On July 23, 2013, this Court entered an order consolidating the Debtors' bankruptcy cases for procedural purposes only. On September 13, 2013, the Debtors filed a proposed joint plan of reorganization, but they have not yet moved for approval of their disclosure statements(s) pursuant to 11 U.S.C. § 1125.

Meanwhile, on May 8, 2013, the SDNY Court entered an order further augmenting the First Augmented Judgment (the "Second Augmented Judgment"). Specifically, the Second Augmented Judgment increased the First Augmented Judgment to $3.4 million. The Order implementing the Second Augmented Judgment stated as follows:

> [This] court explicitly found, as did the Utah Court . . . that the transfers at issue were "part of a substantial long-standing pattern to defraud" ACE and that these transfers were not "made in good faith, given that the donor was essentially in control of the assets." In fact, the Marital Trust, Stock Trust and Realty Trust were all entities effectively and improperly controlled by the

> donor, Robert Rubin, thus rendering as illusionary the Trustee's
> function as an independent administrator of assets. Therefore, the
> transfers at issue were fraudulent conveyances "considered void
> and thus the property or money conveyed are deemed to be that of
> the [Stock Trust]."

On that same day, Robert filed in the SDNY Court a motion for a stay pending appeal,

which the SDNY Court denied on May 10, 2013. In that order, the Court stated that, "[s]hould

[Robert] wish to stay the [various judgments] pending appeal, he may file a supersedeas bond for

the full amount…." None of the Debtors have posted a supersedeas bond. Rather, they are

apparently relying on the automatic stay imposed by 11 U.S.C. § 362(a) to provide the functional

equivalent of a stay pending appeal. Even so, ACE contends (and the Debtors do not dispute)

that it could collect on the Stipulated Judgment as to the Stock Trust alone, even if a supersedeas

bond were posted, but for the automatic stay under 11 U.S.C. § 362(a).

On June 7 and August 21, 2013, the Debtors appealed the foregoing actions of the SDNY

Court to the U.S. Court of Appeals for the Second Circuit. This Court has granted limited relief

from the automatic stay in order to facilitate the prosecution of these appeals.[2] In addition to this,

the Debtors moved the SDNY Court to vacate the Second Augmented Judgment. In denying that

motion, the SDNY Court remarked that it thought the Debtors'

> [m]otion represents merely one more example of a pattern
> of bad-faith dilatory practices that Defendants have employed for
> several years in an attempt to put off the final judgment day in
> these proceedings.

Meanwhile, between May 21-22, 2013, ACE filed its motions to dismiss (or,

alternatively, for relief from the automatic stay) in the bankruptcy cases of Margery and the Trust

Debtors. ACE filed a similar motion in Robert's case on August 9, 2013. These four motions

---

[2] The parties have submitted to this Court fairly significant documentation and argumentation apparently meant to
persuade this Court of the merits of their respective positions on appeal, but of course the merits of the appeal are
for the Second Circuit to decide.

(collectively the "Dismissal Motions") are the only matters disposed of in this Memorandum. The Court held evidentiary hearings on the Dismissal Motions on August 26 and September 19, 2013, at which testimony was heard and documents were received into evidence. On October 7, 2013, the parties submitted proposed findings of fact and conclusions of law to the Court, and the matters were marked submitted as of that date. The Dismissal Motions are ready for disposition.

**Discussion**

Under 11 U.S.C. § 1112(b)(1), the Court may generally dismiss a chapter 11 case "for cause." ACE raises many issues in the Dismissal Motions, but its arguments fall into two basic categories: (1). The Trust Debtors are not "business trusts," and therefore they are ineligible to be debtors in this Court under 11 U.S.C. § 109. (2). All of the Debtors filed their petitions in bad faith. For the reasons that follow, the Dismissal Motions are denied.

I. <u>The Trust Debtors are business trusts under 11 U.S.C. § 109</u>.

An entity that meets the Bankruptcy Code's definition of a "person" may generally be a debtor in chapter 11. 11 U.S.C. § 109(b), (d). "Person" is defined to include a "corporation." 11 U.S.C. § 101(41). A "corporation" is defined to include a "business trust," but not other kinds of trusts. 11 U.S.C. § 101(9)(A)(v). Accordingly, a "trust" may only be a debtor in chapter 11 if it is a "business trust," a term that is "not defined in either the [Bankruptcy] Code or its legislative history." *See Shawmut Bank Connecticut, et. al. v. First Fidelity Bank, et. al. (In re Secured Equipment Trust of Eastern Air Lines, Inc.)*, 38 F.3d 86, 88-89 (2d. Cir. 1994)(*hereinafter Eastern*). The decisions are "hopelessly divided" concerning the precise standard to use when determining whether a trust is a "business trust." [3] *See id.* at 89; *Brady-Morris v. Schilling (In re*

---

[3] Courts have developed a variety of approaches to determining whether or not a given trust is a "business trust." Some courts have required the trust to be substantially similar in many respects to an actual for-profit corporation. Others have applied the narrow, 6–pronged test that has long been used to determine what constitutes a "business trust" or "Massachusetts trust" under the Internal Revenue Code. Still others adopt a much less

*Kenneth Allen Knight Trust)*, 303 F.3d 671, 679 (6th Cir. 2002)(*hereinafter Schilling*). However, clearly it is the Bankruptcy Code that controls eligibility for bankruptcy relief. Accordingly, the Court will make its decision without reference to what constitutes a "business trust" under state law. *See Cutler v. The 65 Sec. Plan*, 831 F.Supp. 1008, 1014-1015 (E.D.N.Y.1993)(*hereinafter Cutler*). The Court must consider both the governing documents of the Trust Debtors and the surrounding circumstances in making this fact-intensive determination. *See Eastern*, 38 F.3d at 90-91.

It is true that some courts have looked to trusts similar in many respects to the Trusts here and concluded that they did not qualify as "business trusts." *See, e.g. In re St. Augustine Trust*, 109 B.R. at 496-497. Nevertheless, for the reasons to follow, the Court feels that the standards applied in these cases are too inflexible to comport with Congressional intent. *Compare Cutler*, 831 F.Supp. at 1014-1016 (favoring flexible approach).

Prior to 1978, in order for a trust to be a debtor in bankruptcy, it had to qualify as a "business trust" or "Massachusetts trust" under the Internal Revenue Code. *In re Gonic Realty Trust*, 50 B.R. 710, 713 (Bankr. D. N.H. 1985)(*hereinafter Gonic Realty).* (quoting *Bankruptcy Act*, § 1(8)). These kinds of trusts are basically "classic" corporations in all but name. *See id.* However, in 1978, Congress amended the law to enable trusts other than "Massachusetts trusts" to be debtors, and to establish an elusive "business trust" standard that makes no reference to any particular checklist of criteria. *See id.* Accordingly, the Court is persuaded by the cases that adopt a flexible view of what constitutes a "business trust," because that interpretation is more "consistent with the remedial nature of the bankruptcy laws," as well as Congress' relaxation of

---

restrictive approach, which tends to focus "primarily on the trust's operations in administering funds or a business to provide profits or an increase in assets for beneficiaries," and thus "depart from the traditional tests for business trusts." *See Cutler, infra*, 831 F.Supp. at 1016 (discussing cases).

the requirements for a "trust" to be eligible for bankruptcy relief. *See id.*; *see also Cutler*, 831 F.Supp. at 1014-1016 (favoring a flexible approach in light of the 1978 amendments).

The Second Circuit has noted that "a basic distinction between a business trust and other trusts is that business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res." *Eastern*, 38 F.3d at 88-89 (quoting *Cutler*, 831 F.Supp. at 1014); *see also Schilling*, 303 F.3d at 680. Accordingly, a trust must engage in business activity in order to be a "business trust," but that alone is not enough. *Eastern*, 38 F.3d at 88-89. Any given trust may have multiple purposes, but ultimately the trust's *primary* purpose is the decisive factor in the analysis. *See id.* at 89-91 (trust not a "business trust" though it engaged in business activity; business activity merely incidental to primary purpose of preserving the *res*); *accord Schilling*, 303 F.3d at 680.

Here, there is no question that one of the purposes of the Trusts is to create an estate-planning vehicle to preserve Robert's assets for the benefit his family. The Trusts' indentures contain language stating that "[Robert] desires to establish an irrevocable trust for the purpose of avoiding probate and avoiding estate administration." Also, each trust agreement contains elaborate provisions governing the distribution of the trust corpus upon the death of either of the Rubins. Nevertheless, this does not necessarily mean that the Trust Debtors are not "business trusts," so long as their <u>primary</u> purpose is to do business. *See In re Jin Suk Kim Trust*, 464 B.R. 697 (Bankr. D. Md. 2011)(*hereinafter Kim Trust*)(finding a trust to be a "business trust" even though it was also apparently meant to serve as an estate-planning vehicle).

Moreover, ACE is correct in claiming that the Trusts lack many of the traditional attributes of a corporation, but here ACE focuses on formalistic checklists rather than on the "primary purpose" and actions of the Trusts. A trust does not need to have employees, an

independent board, shareholders, alienable ownership interests, and other "corporate" attributes to be a "business trust," especially after the 1978 amendments. *See In re General Growth Properties, Inc.,* 409 B.R. 43, 70-71 (Bankr. S.D.N.Y. 2009)(*hereinafter General Growth*) (finding a trust to be a "business trust" even without all these attributes); *accord Gonic Realty*, 50 B.R. at 714.

Similarly, ACE relies on the expert testimony of Mr. Derk Rasmussen, CPA, who reviewed the Trust Debtors' tax returns and financial records and concluded that they "do not operate a business, they hold assets [in trust] in a passive nature for income generation via passive investment holdings." Nevertheless, even if a trust does not "operate a business" from a strict tax or accounting perspective, that does not preclude it from "doing business" in the common, ordinary sense of the term—and it is the common, ordinary sense of statutory language that must guide the Court's decision. *See Pioneer Inv. Svc's Co. v. Brunswick Assoc's L.P.*, 113 S.Ct. 1489, 1495 (1993)(noting that "[c]ourts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning")(internal quotes omitted).

Generally, where a trust was established with a profit motive, that factor militates significantly in favor of finding that its *primary* purpose is to do business, even if it was established for other purposes, also. *See Eastern*, 38 F.3d at 90; *accord General Growth*, 49 B.R. at 70. The foregoing background recitation of the subject trusts make it clear that the Trust Debtors habitually engaged in substantial economic activity, which was meant to realize a profit for the beneficiaries. The Trust Debtors borrowed and lent funds, invested, made, and lost millions of dollars in their various dealings. The Realty Trust acquired a fairly sophisticated network of subsidiary entities to deal with its realty holdings, which generate significant annual

revenue. These trusts took business risks in order to increase the monetary value of assets they purchased. The Stock Trust controls $50,450.12[4] in assets, and the Realty Trust controls over $6.54 million in assets, having been settled with a $100 investment. Surely, no one would consider such activity to be anything other than "business activity" with a "profit motive" in the common, ordinary sense of these terms.

Moreover, the manner in which the Trust Debtors conducted business is clearly inconsistent with the notion that their <u>primary</u> purpose was to "protect and preserve" the res, because they continually put hundreds of thousands (at times even millions) of dollars' worth of the *res* at great risk in the course of chasing after profits.[5] Many of the Stock Trust's investments were in new, start-up companies, which tend generally to be risky investments since they often fail.[6] However, the profit potential if they succeed can be tremendous. Thus, the Stock Trust employed a "high risk, high reward" approach to investing.

The Realty Trust also invested millions in finding new and profitable properties. While some consider real estate to be a generally less-risky investment than securities, events in recent years have undercut that assumption. Moreover, the Realty Trust at least twice has invested substantial monies in risky (and ultimately unsuccessful) offshore development projects in the Dominican Republic and Costa Rica.

In light of all this risk-taking with the *res*, it would defy reason to conclude that the <u>primary</u> purpose of the Trust Debtors is to "protect and preserve" it. If the protection and

---

[4] Initially, the Stock Trust listed $1.6 million in assets, but later amended its schedules to reduce greatly the stated values for its equity positions in various entities.

[5] The situation here is analogous to the situation in *Kim Trust*, where the court found the trust at issue to be a business trust. The trust debtor was set up as "a generation skipping trust that allowed the original trust corpus to be passed on to the beneficiaries named by Kim [the trustee and beneficiary] in her will while (supposedly) providing income to Kim, the Grantor's only child [and the trustee/beneficiary]." *Kim Trust*, 464 B.R. at 699.

[6] For an example of this, see Deborah Gage, *The Venture Capital Secret: 3 out of 4 Start-Ups Fail*, The Wall Street Journal Business, http://online.wsj.com/news/articles/SB10000872396390443720204578004980476429190 (last updated Sept. 20, 2012)(noting that "[a]bout three-quarters of venture-backed firms in the U.S. don't return investors' capital.").

preservation of the *res* were the Trust Debtors' <u>primary</u> purpose, then they would invest much more conservatively than they have done. Indeed, the fact that the various trust indentures here gave the Trustees such broad power to put the *res* at risk indicates that it was the Trusts' purpose from the beginning to make a profit above all else. *Compare Kim Trust*, 464 B.R. at 700. Therefore, in light of all this, the Court finds that the "primary purpose" of the Trust Debtors is to conduct business for profit. Also, Robert and Margery were intimately involved with these business endeavors, as the above facts illustrate. Accordingly, Trust Debtors are "business trusts" under 11 U.S.C. § 101(9)(A)(v), and they are eligible to be debtors under 11 U.S.C. § 109(d).

II. <u>Bad faith</u>.

"Cause" for dismissal of a chapter 11 case (or conversion of the case to chapter 7) under 11 U.S.C. § 1112(b) includes bad faith in the filing of the petition. *In re SGL Carbon Corp.*, 200 F.3d 154, 159-160 (3d. Cir. 1999). *Accord* 7-1112 *Collier on Bankruptcy* ¶ 1112.07 (16th Ed. 2013)(*hereinafter Collier's*). Furthermore,

> [t]he initial burden of proof for conversion or dismissal lies with the moving party. *See In re Santiago Vela*, 87 B.R. 229, 231 (Bankr. D. Puerto Rico 1988). Once the debtor's good faith has been put into question, the debtor bears the burden of proving good faith. *See In re Scheffler*, 86 B.R. 576, 578 (Bankr.W.D.Wis.1986) (quoting *In re Setzer*, 47 B.R. 340 (Bankr.E.D.N.Y.1985)).

*In re Copy Crafters Quickprint*, 92 B.R. 973, 985 (Bankr. N.D.N.Y. 1988).

Moreover, "[c]ase law recognizes that a bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution." *General Growth*, 409 B.R. at 56 (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir.1989)). In the Second Circuit, two elements must be satisfied before a case may be dismissed or converted for bad-faith filing: (1). The debtor filed the petition in subjective bad faith. (2). Carrying on the reorganization process is objectively futile. Only if <u>both</u> "subjective bad faith" <u>and</u> "objective futility" are found may a

petition be dismissed for bad-faith filing. *See id.* (citing *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr.S.D.N.Y.1997)). The decision will ultimately turn on the unique facts of each case. *See In re Setzer*, 47 B.R. 340, 345 (Bankr. E.D.N.Y. 1985)(noting that "the [bad-faith] determination can only be made on an *ad hoc* basis").[7]

### A. Subjective bad faith.

Subjective bad faith deals with the debtor's internal motivation for filing the petition. As one court noted, "Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or cunning individual." *In re Rognstad*, 121 B.R. 45, 50 (Bankr.D. Haw. 1990). Thus, subjective good faith requires an "honest intention on the debtor's part to reorganize his financial affairs" in accordance with the policies underlying the Bankruptcy Code. *See In re Setzer*, 47 B.R. at 345. Thus, generally, any petition filed for an improper purpose inconsistent with those aims, or with the intent to gain an unfair advantage over creditors and other adverse parties, may be found to have been filed in subjective bad faith. *See id.; accord Collier's, supra* at ¶ 1112.07. A petition is generally filed in subjective bad faith when it is filed solely to cause hardship to creditors, without any real ability or willingness to reorganize (or liquidate in an orderly manner) for the benefit of all parties in interest. *See Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989).

---

[7] The leading "bad faith" case in the Second Circuit is *C–TC 9th Ave. P'ship v. Norton Co. (In re C–TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir.1997)(*hereinafter C-TC*), in which the Second Circuit set forth a lengthy list of factors to be considered in making a finding of bad faith. However, as noted in *General Growth, supra*, that case dealt with "a single-asset real estate debtor, where the equity investors in a hopelessly insolvent project were engaged in a last-minute effort to fend off foreclosure and the accompanying tax losses." Thus, the factors set forth in *C-TC* case are geared towards analyzing whether or not a single-asset real estate ("SARE") debtor filed in bad faith. Accordingly, most of them are not particularly helpful in cases like those of the Debtors here, which fall outside of the SARE paradigm. *Compare General Growth*, 409 B.R. at 56.

ACE argues strenuously that the Debtors are improperly using the automatic stay of 11 U.S.C. § 362(a) as a stay pending appeal, without having to post a supersedeas bond. Generally speaking, in federal court,

> If an appeal is taken, the appellant may obtain a stay by supersedeas bond…. The bond may be given upon or after filing the notice of appeal or after obtaining the order allowing the appeal. The stay takes effect when the court approves the bond.

Fed. R. Civ. P. 62(d). Commonly, "[a]n appellant is entitled to a stay on execution of the judgment as a matter of right if it posts bond in accordance with Rule 62(d)." *Wilmer v. Bd. of Cty. Com'rs of Leavenworth Cty., Kan.*, 844 F.Supp. 1414, 1417 (D. Kan. 1993). Moreover, "[t]he purpose of requiring a supersedeas bond is to secure an appellee from loss resulting from the stay of execution." *Id.* (internal quotes omitted). Admittedly, none of the Debtors here has posted a supersedeas bond in order to stay ACE from executing upon the various judgments which are on appeal to the Second Circuit. Rather, they are relying on the automatic stay of 11 U.S.C. § 362(a) to fulfill that basic purpose.

ACE maintains that a case must be dismissed for bad faith when a debtor files for bankruptcy in order to stay execution pending appeal without posting a supersedeas bond, even though the Debtor has sufficient assets to pay the judgment; according to ACE, the only situation where a Debtor may file a bankruptcy petition to stay a judgment pending appeal in good faith, without a bond, is when the Debtor is unable to post a bond otherwise, at least without significant disruption to its business operations. This view seems to accord with a general theme in the cases. *See, e.g. In re Marsch*, 36 F.3d 825 (9th Cir. 1994); *In re Harvey*, 101 B.R. 250 (Bankr. D. Nev. 1989); *In re Holm*, 75 B.R. 86 (Bankr. N.D. Cal. 1987); *In re Chu*, 253 B.R. 92 (Bankr. D. Cal. 2000); *In re Wallay Findlay Galleries (New York), Inc.*, 36 B.R. 849 (Bankr. S.D.N.Y. 1984). *See also discussion in In re Marshall*, 298 B.R. 670, 683-684 (Bankr. C.D. Cal.

2003). Many cases take a harsh view of debtors in situations like this, out of a concern that the debtor is filing the case "for… tactical reasons unrelated to reorganization," and "that the petition is merely a litigating tactic designed to act as a substitute for a supersedeas bond…." *See, e.g. In re Marsch*, 36 F.3d at 828.

Nevertheless, the subjective-bad-faith inquiry, much like the "business trust" issue, is intensely fact-driven, and it is therefore not amenable to bright-line rules and itemized checklists. Moreover, it is not at all unusual for a debtor to seek refuge in Bankruptcy Court from the weight of a pre-petition judgment. Indeed, "the express purpose of the automatic stay under § 362 is to provide a breathing space for the debtor," which necessarily entails some inconvenience and delay to creditors. *See In re Marshall*, 298 B.R. at 683-684.

Here, the Court finds that the Debtors' conduct here does not evidence an intention "*unreasonably* to deter or hinder creditors through abuse of the bankruptcy process," but rather to prevent a "chaotic dismemberment of the [their] assets with resulting damage to the [Debtors]… and creditors alike." *Compare In re Marshall*, 298 B.R. at 683 *with In re Ford,* 74 B.R. at 938. In light of the interconnected nature of the Debtors' combined business operations, a piecemeal liquidation of their assets by the Receiver (with his omnipotent powers), or the posting of sufficient collateral for a $3.4 million supersedeas bond, could very well cause great harm to the Debtors, while yielding less value for creditors than could be done by an orderly liquidation (or leveraging) of assets pursuant to a confirmed plan of reorganization. *Compare In re Ford*, 74 B.R. at 938. Moreover, as ACE acknowledges, the automatic stay is the only thing stopping ACE from executing on the Stipulated Judgment against the Stock Trust. Again, given how intricately

connected the Debtors' interests have been, enforcement against the Stock Trust could produce significant adverse collateral effects for the other Debtors. [8]

The Court is aware that the Debtors have filed a plan of reorganization that proposes to pay ACE in full in the event that the Debtors lose on appeal to the Second Circuit.[9] While ACE raises many issues concerning the confirm-ability of the Debtors' plan, that matter is not before the Court. What matters here is that (1) Debtors have proposed a plan that pays ACE in full, if necessary, and (2) no one really disputes that the Debtors have more than sufficient assets to do so. These things taken together indicate that the Debtors are willing and able to pay ACE, if required—which is the antithesis of bad faith. *Compare In re Ford*, 74 B.R. 934 (Bankr. S.D. Ala. 1987)(finding good faith where debtor had sufficient assets to pay judgment, but filed bankruptcy in order to stay appeal without posting bond; while other factors were considered, court focused mainly on fact that debtor had proposed plan calling for judgment creditor to be paid if debtor lost on appeal). Thus, the fact that the Debtors filed their petitions to stay

---

[8] The Debtors point to the TRO of April 5, 2013 (together with the SDNY Court's remark that it would not permit the Debtors to "un-attach" assets to post an appeal), and argue that this order gave them a good faith basis to conclude that they would not be able to post a supersedeas bond. Nevertheless, between April 5, 2013 and April 23, 2013, Margery wrote $53,366 in checks to Robert, certain of the Rubins' children, and an entity called "Hometown Pest Control." However, looking at the dates of the respective checks and giving Margery the benefit of the doubt, it seems that the vast bulk of the total amount of the checks could have been written either (1) on April 5, 2013 before Margery and the other Debtors got word of the TRO, or (2) on April 23, 2013 after the April 23 Order (which apparently reduced the scope of assets restrained by the TRO) was handed down. The one check written on April 8, 2013, in the amount of $326 to Hometown Pest Control, seems *de minimis*.

Additionally, ACE points to certain language in the May 8, 2013 order of the SDNY Court denying a stay pending appeal, where the SDNY Court remarked that if the Debtors wanted to stay the proceedings pending appeal, they could post a supersedeas bond under Federal Rule 62. ACE relies on this language to indicate that the Debtors knew they could have posted a supersedeas bond if they wanted to. However, the only Debtor to which this argument could possibly apply is Robert, since the other 3 Debtors filed their petitions on April 27, 2013, well before the issuance of the May 8 order.

[9] The plan apparently proposes to pay ACE's allowed secured claim in full within 120 days after (1) the Second Circuit decides the pending appeals, assuming that its judgment is adverse as to all the Debtors, and (2) after this Court determines the status of ACE's claims here, as needed. If ACE's judgment is valid as against less than all the Debtors, the non-liable Debtors retain discretion to help pay the claim, but the liable Debtor(s) may consent to dismissal of their cases after surrendering their assets to ACE. The funds to pay ACE are to come from cash on hand, plus any proceeds derived from exit financing or liquidation of assets. ACE's claim is listed as "unimpaired," which if true would render ACE ineligible to vote on plan confirmation under 11 U.S.C. §§ 1124, 1126(f).

enforcement of ACE's judgments pending appeal is not enough to convince the Court that there is bad faith here.

ACE also points to various findings of the SDNY Court and the Utah District Court that the Debtors and the Marital Trust engaged in pre-petition fraudulent transfers so as, in the words of the SDNY Court, "to put off the final judgment day in these proceedings." ACE argues that the Court ought to give these findings *res judicata* or collateral-estoppel effect, and then use that as a basis to find that the Debtors must have filed their petitions in bad faith.

Even if the Court were to accept that argument, it would not necessarily require (or even permit) the Court to dismiss these cases for bad faith. *Compare Coleman et. al. v. Community Trust Bank et. al. (In re Coleman)*, 426 F.3d 719 (4th Cir. 2005)(petition not filed in bad faith even though debtor admittedly fraudulently transferred assets pre-petition; unsecured creditors would benefit from avoidance of the fraudulent transfers, so no objective futility even if debtor's motives were impure).

The Court finds that it would be premature to afford *res judicata* treatment to the various findings of the other courts while the appeals to the Second Circuit are pending. It is true that many courts have held that a final judgment should be given *res judicata*[10] effect even if it is subject to being avoided on appeal—indeed, this is the position taken by Restatement (Second) of Judgments. However, other courts take the opposite tack, holding that a judgment should not receive *res judicata* effect until it is final and un-appealable. *See* Restatement (Second) of Judgments § 13, *comments f and g* (discussing the cases).

Nevertheless, as the Restatement itself acknowledges, application of its position "may give rise to a problem of inconsistent judgments when a judgment under appeal, relied on as a basis for a second judgment, is later reversed." *Id.* at § 13, *comment f.* In order to deal with this

---

[10] As used herein, *res judicata* refers to both claim and issue preclusion, as applicable.

problem, the Restatement suggests letting the second judgment stand, and requiring the party harmed by it to move to set it aside. *See id.* at § 16 (with comments).

Thus, if this Court were to follow the position of ACE and the Restatement, it would dismiss the petition on bad-faith grounds based upon the prior findings of fraudulent transfers, notwithstanding that the Second Circuit might reverse those findings on appeal. If that happens, then the Debtors here may have to make a motion under Fed. R. Civ. P. 60(b) for relief from the dismissal order, or perhaps even file new petitions. This would cause these estates to incur needless expense, to the detriment of creditors.

Therefore, the Court declines to give *res judicata* effect to the prior fraudulent-transfer and related findings of the other courts, at least while they might still be reversed on appeal. If the Second Circuit upholds those findings, then ACE may certainly come back to this Court and seek appropriate relief.

ACE also points to many asserted deficiencies and omissions in the Debtors' schedules and monthly operating reports, alleging that they indicate a cavalier disregard for the disclosure obligations of bankruptcy which, in turn, evidences bad faith. Indeed, at Robert's 341 meeting, the representative of the United States Trustee became very frustrated at what he perceived to be gaps in the information provided in Robert's schedules.

It is true that certain serious discrepancies, omissions, and falsehoods in a debtor's schedules and reports can indicate bad faith. *See Collier's, supra* at ¶ 1112.07. Nevertheless, dismissal should only take place if the asserted deficiencies thwart the purpose of the schedules and reports in chapter 11, which is to "inform creditors of the nature of the debtor's assets and liabilities," so that "interested parties [have] enough information to decide whether they want to engage in further inquiry." Accordingly, "minor errors that do not result in giving a deceptive

impression or other prejudice should not be the basis for limiting the debtor's rights." *In re Marshall*, 298 B.R. at 677 (internal cites and quotes omitted).

In their schedules, the Debtors disclose approximately $13.9 million in total assets and multiple millions of dollars in liabilities.[11] Most of the issues ACE identifies here, in terms of the dollar amounts implicated, seem infinitesimally small as a percentage of what has already been disclosed. Others have been satisfactorily addressed by Robert's testimony. No one has seriously contended that any of ACE's identified omissions or discrepancies inured to the material prejudice of any party-in-interest, or that any of the alleged discrepancies result in a material misimpression of the nature and value of the assets here.

To the extent there might remain gaps or inconsistencies in the information provided: If, going forward, the Debtors' schedules and reports are not appropriately corrected and supplemented, then that may serve as a distinct basis for dismissal or other appropriate relief at a later time—but not now.[12] For now, the Debtors should have a chance to correct these issues, as needed, so that they can finish their appeals and attempt an effectual restructuring or liquidation, for the benefit of all parties.

**B. Objective futility.**

For the reasons that follow, even if the Court agreed with ACE's arguments concerning the Debtors' subjective bad faith, it could not dismiss these cases, because objective futility is not apparent. *See Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989))(noting that "even if

---

[11] The Debtors initially disclosed a total of $15.4 million in assets, but later the Stock Trust amended its schedules to reflect substantially lower values for its equity positions in various companies than what was previously indicated. Robert also amended his schedules to indicate slightly lower values for certain assets.

[12] ACE raises another related matter. Robert hired the law firm of Mintz and Fraade to represent him in certain litigation related to AV Therapeutics on a date which came after the date he filed his bankruptcy petition. As Robert is now a debtor in possession under chapter 11, he may not simply hire attorneys to represent him in any litigation without obtaining leave of the Court as required under 11 U.S.C. § 327. However, it is not unheard of for courts to grant *nunc pro tunc* retention applications; so long as Robert brings one, and it is granted, there should be no problem in this regard. If no such retention application is ever made or granted, then Mintz and Fraade cannot be compensated from Robert's bankruptcy estate.

subjective bad faith in filing could properly be found, dismissal is not warranted if futility cannot also be found.") *Accord General Growth*, 409 B.R. at 56. "Objective futility" is met where there is no reasonable possibility of a prompt, successful reorganization—or no real need for one. *See In re McDermott*, 78 B.R. 646, 651 (Bankr. N.D.N.Y. 1985).

ACE points out that the Debtors are "very solvent," and seems at least to imply that they have no real need to be in bankruptcy, because they have more than enough assets to pay ACE's judgments. However, it is well-established that even solvent debtors are eligible for bankruptcy filing, so long as they are under sufficient, more-than-speculative financial pressure to justify their invocation of the protections of the Bankruptcy Code. *See General Growth*, 409 B.R. at 57. As the foregoing discussions indicate, the Debtors here were subjected to significant financial pressure as a result of the events that took place before the SDNY Court; thus, even if they are solvent, they can still be said to have "need" of the protections of bankruptcy.

Moreover, it is far from clear here that these Debtors have no realistic prospect of a prompt, successful reorganization. ACE refers to the Debtors' filed plan of reorganization to argue that the Debtors have no prospect of reorganization, because the plan as proposed is not confirmable. Again, the confirm-ability of the Debtors' plan is not before the Court. The Debtors ought to have the chance to fight for their plan and, if necessary, to amend it before this Court relies on the plan as a basis to drive them out of bankruptcy. Moreover, courts have found plans to be feasible in situations where the debtors had far fewer assets, relative to liabilities, than these Debtors do, so from a common-sense perspective it is hard to see how reorganization is "objectively futile" here.

ACE also argues that these Debtors cannot reorganize due to various conflicts of interest. Specifically, Margery (in her capacity as trustee of the Trust Debtors) owes millions of dollars to

Margery (in her capacity as trustee of the Marital Trust). Relatedly, ACE argues that Margery (as trustee of the Trust Debtors) ought to try to avoid the obligations of the Trust Debtors to the Marital Trust, and ought to more aggressively pursue obligations owed to the Realty Trust by its subsidiaries, the McClain-Rubin entities (which the McClains operate and manage for the Realty Trust). ACE says that Margery's failure to do so is the result of conflicting loyalties, as illustrated by the many thousands of dollars that the McClains have apparently gifted to the Rubins in recent years (including $35,000 in American Express payments). ACE says these gifts are being made in lieu of the payments due under the notes made out by the McClain-Rubin entities in favor of the Realty Trust. ACE says that the Rubins are living off these gifts, and hence are unlikely to seek to collect on the notes for the Realty Trust, which presents a conflict.

Nothing in the Code requires any trustee or debtor-in-possession mindlessly to seek avoidance of every single claim against the estate, without giving any forethought to what issues might have to be dealt with in the process.[13] Nevertheless, it is true that "claims against the affiliated companies must be pursued impartially and in good faith." *Matter of Natural Plants and Lands Mgm't Co., Ltd.*, 68 B.R. 394, 395 (Bankr. S.D.N.Y. 1986).

If indeed these Debtors truly cannot reorganize because they are being administered by fiduciaries with conflicting loyalties, then dismissal is not in the best interests of the estates and parties in interest. Mere dismissal would not resolve the conflicts issue. By contrast, conversion of each case to chapter 7, or appointment of a chapter 11 trustee or examiner in each separate case, would assure all creditors and parties in interest that impartial fiduciaries were

---

[13] Neither party has said anything about whether there is even a basis to conclude that the various obligations between the Trusts are avoidable—except perhaps to point to the prior decisions in the SDNY Court, which held in part that certain transfers between the Trusts were void under New York law because Robert (the donor) was essentially in control of all the Trusts' assets due to the great influence he apparently exercised in his role as "advisor." As explained above, the Court declines to give *res judicata* effect to those proceedings at this time, because it would be premature to do so in light of the pending appeals to the Second Circuit.

administering each separate estate, and that "claims against the affiliated [debtors would] be pursued impartially and in good faith." *See id.; compare In re Hampton Hotel Investors, LP*, 270 B.R. 346, 359-360 (Bankr. S.D.N.Y. 2001). As yet, no one has requested any of these remedies—indeed, ACE has strenuously argued against conversion to chapter 7. Accordingly, these cases will not be dismissed, as the Court does not find bad faith on the part of the Debtors.

III. <u>Relief from the automatic stay</u>.

ACE bases its request for relief from the stay on essentially the same arguments already addressed herein. Accordingly, that relief is denied.

<u>**Conclusion**</u>

It is very common for debtors to seek refuge in Bankruptcy Court from the consequences of adverse judgments rendered against them in other courts, even when they are otherwise solvent. Many cases could not be maintained if filing in the aftermath of an adverse judgment were *per se* deemed to be done in bad faith. Moreover, some delay and frustration on the part of creditors is a necessary attribute of bankruptcy. Indeed, as the Seventh Circuit noted, "[i]t is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?" *Matter of James Wilson Assoc's*, 965 F.2d 160, 170 (7th Cir. 1992).

Here, the Court finds that all the Trust Debtors are business trusts. Moreover, the Court is not convinced that there is bad faith here, or that dismissal is the appropriate remedy. In the event that ACE can prove a conflict of interest on the part of those currently in charge of the Debtors' estates, or any other basis for such relief, the Court will consider those motions when presented. At this time, the Court finds that the Debtors did not file their petitions in bad faith. Therefore, ACE's current Dismissal Motions are denied in their entirety, without prejudice to the

ability of ACE or any other interested party to seek other appropriate relief at the proper time.

The Court will issue a separate order in each case, in conformity with this Memorandum.



Dated: Central Islip, New York
      November 21, 2013

**Dorothy Eisenberg**
**United States Bankruptcy Judge**